ERIK A. CHRISTIANSEN (7372)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Salt Lake City, UT  84111
Telephone:  (801) 532-1234
Facsimile:  (801) 536-6111
Email Address: echristiansen@parsonsbehle.com
Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| RALPH O. STALSBERG, an individual, LONNIE R. STALSBERG, AS TRUSTEE FOR, THE RALPH O. STALSBERG IRREVOCABLE TRUST I dtd. 9/28/2004,<br><br>Plaintiffs,<br><br>vs.<br><br>NEW YORK LIFE INSURANCE COMPANY, NEW YORK LIFE INSURANCE AND ANNUITY CORPORATION,<br><br>Defendants. | **COMPLAINT**<br><br>Civil Action No. 2:07-cv-29<br><br>Judge Bruce S. Jenkins<br><br>JURY TRIAL DEMANDED |

COMES NOW plaintiffs Ralph O. Stalsberg, and Lonnie R. Stalsberg, as trustee for the Ralph O. Stalsberg Irrevocable Trust I dtd. 9/28/2004, and for their complaint alleges and complains as follows against defendants New York Life Insurance Company and New York Life and Annuity Corporation (collectively "New York Life").  Allegations in this complaint concerning the plaintiffs' own actions are based upon personal knowledge.  All other allegations are based on information and belief.

932819.1

## INTRODUCTION

1.     This action arises out of New York Life's unlawful and bad faith cancellation of a life insurance policy insuring the life of Ralph O. Stalsberg. Ralph Stalsberg's son Lonnie R. Stalsberg, a Utah resident, obtained the life insurance policy on his father on January 21, 2005. The Policy had a face value of $3,570,000 (the "Policy") and was placed in an irrevocable trust, the beneficiaries of which are Ralph Stalsberg's children. As trustee, Lonnie Stalsberg was at all times the owner of the Policy. Ralph Stalsberg and Lonnie Stalsberg made no misrepresentations on the application for the Policy, nor any other misrepresentations in connection with the Policy. All premiums on the Policy were timely paid.

2.     As required under Utah Code Ann. § 31A-22-403(2), the Policy provided that New York Life could contest coverage and/or rescind the Policy within two years from the date on which the Policy was issued. Despite plaintiffs' compliance with each and every term of the Policy, New York Life informed plaintiffs on the eve of the Policy's two-year anniversary that it was rescinding the Policy. Because New York Life had no reasonable or valid basis to rescind the Policy, plaintiffs filed this action to reinstate the Policy and otherwise to protect their rights.

## THE PARTIES

3.     Ralph O. Stalsberg is an individual who resides in Grant County, Washington.

4.     Lonnie R. Stalsberg is an individual who resides in Salt Lake County, Utah.

5.     On information and belief, New York Life Insurance Company is a mutual insurance company organized and existing under the laws of the State of New York having its principal place of business in New York County, New York. New York Life Insurance Company is engaged in the business of, *inter alia*, selling life insurance policies.

6. On information and belief, New York Life and Annuity Corporation is a subsidiary of New York Life Insurance Company and a corporation organized and existing under the laws of the State of Delaware having its principal place of business in New York County, New York. It is authorized to engage in the business of, *inter alia*, selling variable life insurance policies.

### JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between all plaintiffs and all defendants, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8. Venue is appropriate in this district because the acts alleged herein occurred primarily in this district, Lonnie Stalsberg resides in this district, and defendants conduct business in this district.

### RALPH O. STALSBERG'S ESTATE PLAN

9. Ralph Stalsberg is 83 years old. He has two children: a son, Lonnie R. Stalsberg, and a daughter, Sandra J. Huntington. Ralph Stalsberg's personal net worth exceeds the level triggering liability for federal estate taxes. As part of his estate planning, Ralph Stalsberg sought to pursue a strategy that would shift wealth to the next generation to minimize estate or other taxes.

10. One method by which individuals provide for their heirs is by purchasing life insurance for the benefit of the heirs. Had Ralph Stalsberg purchased a life insurance policy in his own name for the benefit of his children, any proceeds from that policy would, on his death, become part of his estate and would be subject to estate tax. Estate tax can be avoided, however,

by acquiring and holding a life insurance policy through an irrevocable insurance trust. An irrevocable trust is commonly used in estate planning and serves to alienate any of the insurance proceeds away from the insured's estate. Instead, insurance proceeds are paid to the trustee of the irrevocable trust at the time of the insured's death.

11.     Ralph Stalsberg sought to take advantage of these tax-saving strategies by creating the Ralph O. Stalsberg Irrevocable Trust I (the "Stalsberg Trust") by an agreement (the "Trust Agreement") dated September 28, 2004. His son, Lonnie Stalsberg, is trustee of the Stalsberg Trust. The Trust Agreement provides that "[a]ll right, title and interest in and to any policies of insurance forming part of the trust estate shall be and are hereby vested in the Trustee." The beneficiaries of the Stalsberg Trust are Ralph Stalsberg's surviving children or their surviving descendants. Under the Trust Agreement, Ralph Stalsberg, as grantor, may add assets to the Stalsberg Trust, including policies of insurance insuring his life. The Policy issued by New York Life was one such policy.

## ACQUISITION AND FINANCING OF THE POLICY

12.     To achieve the estate-planning objectives discussed above, Lonnie Stalsberg, as trustee of the Stalsberg Trust, applied for and obtained the Policy from New York Life. On January 21, 2005, the Policy was issued to the Stalsberg Trust in Utah. The Policy is a universal life policy with an initial base face amount of $3,570,000. Universal life policies have an "investment" feature in the form of a cash value account. This side fund holds any excess cash contributed to the policy. In other words, premium payments that exceed the cost of insurance – the mortality and expense charges necessary to provide the pure death protection – are credited to cash value. The cash value is then credited each month with interest. In this case, the Policy

has a guaranteed interest rate of at least 3%.  Under the terms of the Policy, if the required premiums are paid for ten years, the Policy will never lapse.

13. The Stalsberg Trust had and has an insurable interest in the life of Ralph Stalsberg, including because the beneficiaries of the Stalsberg Trust are Ralph Stalsberg's children and their heirs.

14. In deciding how to fund the Policy premiums, Ralph Stalsberg faced three basic alternatives: (a) pay the required premiums himself; (b) transfer to the Stalsberg Trust sufficient funds to pay the required premiums; or (c) finance the premiums through a loan arrangement between the Stalsberg Trust and an appropriate lending institution.  Because options (a) and (b) would have involved tax obligations under federal gift tax rules, a premium financing arrangement was selected in which a loan was made to the Stalsberg Trust for purposes of paying certain insurance premiums, and security interest in the Policy was pledged by the Stalsberg Trust to the lender.

15. It is common practice for lenders to loan money to insurance policy owners secured by a security interest in the insurance policy.  Indeed, New York Life expressly agreed to permit loans secured by the Policy.  The Policy states that: "Using this policy as sole security, [the policyholder] can borrower any amount up to the loan value of this policy."  Policy § 5.10 (attached hereto at Exhibit 1).  The loan value from New York Life "is equal to 100% of the Cash Surrender Value, less the current loan interest rate, less an amount that is sufficient to keep this policy in force for at least 3 months."  *Id*.

16. While New York Life itself was willing to make a loan in an amount up to the "loan value" stated in the Policy, other lenders were willing to make loans in a larger amount.

This is because the market value of the Policy – that is, the price at which a third party would be willing to purchase the policy outright, based on the death benefit and cash value of the policy discounted by the life expectancy of the insured and other factors – is significantly higher than the cash surrender value recognized by New York Life.  Because the Stalsberg Trust was able to obtain more favorable loan terms in the marketplace than were available from New York Life (and in particular because other lenders were willing to make a loan in a larger amount than that available from New York Life), the Stalsberg Trust borrowed money from a lender other than New York Life.

17.  On April 20, 2005, the Stalsberg Trust entered into a Note and Security Agreement ("Note," attached at Exhibit 2) with LaSalle Bank National Association ("LaSalle"). Under the Note, LaSalle loaned the Stalsberg Trust $667,470 to be used to pay the premiums on two life insurance policies, including the Policy and another life insurance policy issued by another insurance company.  The Note provides that the principal amount of the loan, plus accrued interest, must be paid on the maturity date, which is defined to include the earliest of a scheduled maturity date, the date on which the loan is prepaid in full, or the date on which death benefits under the Policy are paid in an amount sufficient to repay the loan.  LaSalle also appointed Coventry Capital I LLC ("Coventry') as servicing agent of the loan.

18.  Under the Note, the Stalsberg Trust agreed to provide LaSalle a security interest in the policy.  In order to permit its security interest to be perfected, LaSalle and the Stalsberg Trust entered into a Policy Control Agreement (attached at Exhibit 3).  Under the Policy Control Agreement, LaSalle agreed to act as securities intermediary and maintain a securities account to hold the Policy.  Under Article 8 of the Uniform Commercial Code, a securities account is an

account owned and controlled by a customer (such as the Stalsberg Trust) to hold securities or other financial assets; a securities intermediary is a person (such as LaSalle) who acts as custodian for purposes of holding securities and other financial assets for its customer (*e.g.*, the Stalsberg Trust) and to act on the instructions of such customer with respect thereto; and a securities entitlement is an interest in securities or financial assets that are credited to such account, which interests are those of the account holder or a third person, such as a lender, who becomes an "entitlement holder" with respect thereto. The purpose of securities intermediary arrangements is to enable lenders to take security interests in collateral held in securities accounts, rather than to insist on physical delivery of securities, endorsement over or other methods of perfection.

19. While the Policy Control Agreement provided that the Policy would be held in a securities account administered by LaSalle as securities intermediary, nothing about that arrangement changed the fact that the Stalsberg Trust was, and to this day remains, the owner of the Policy. The Policy Control Agreement defines the "Owner" of the Policy as "the Ralph O. Stalsberg Irrevocable Trust I DTD. 09/28/2004." The Policy Control Agreement further provides that the Stalsberg Trust "does not intend to transfer or surrender to any other person ownership of the Policy or the right to designate the beneficiary thereof prior to the maturity of such borrowings, and the parties hereto acknowledge that the Owner is the party that has the insurable interest in each person whose life is insured by the Policy." Policy Control Agreement at 1. As trustee for the Stalsberg Trust, Lonnie Stalsberg is and always has been the owner of the Policy.

20.     Purely for purposes of administering the loan arrangement and related security interest, the Stalsberg Trust (through its servicing agent Coventry) updated the records of New York Life to reflect LaSalle, as securities intermediary, as the "record owner" of the Policy. New York Life confirmed this update to its records on February 1, 2006.  At no time between February 1, 2006 and January 8, 2007 – the date of its letter purporting to rescind the Policy – did New York Life question the validity of this arrangement.

21.      Neither as a matter of law under the Uniform Commercial Code nor as a matter of the intentions of the Stalsberg Trust or LaSalle did this recordkeeping change alter the underlying ownership of the Policy, which remained at all time with the Stalsberg Trust.  Indeed, as of the date of New York Life's purported rescission of the Policy, LaSalle was no more the "owner" of the Policy than a home mortgage lender is the owner of a home that secures a mortgage loan, despite the fact that such a lender might be named as the beneficiary of a homeowner's insurance policy covering the home; in each case the lender claiming an interest in a policy of insurance does so solely by virtue of its security interest in the collateral, and not as "owner" in any relevant legal sense.

22.     The Policy Control Agreement and the Note in no way limit the Stalsberg Trust's ownership rights nor its ability to maintain or dispose of the Policy in any of the ways available to any insurance policy owner.  Under the Note, the Stalsberg Trust may choose to prepay the loan to LaSalle at any time and by any means while maintaining the Policy for the benefit of the trust beneficiaries (*i.e.* the children of Ralph Stalsberg and their heirs).  Another option available to the Stalsberg Trust is to wait until it collects the proceeds from the Policy upon Ralph Stalsberg's death, use those proceeds to pay off the loan, and distribute any excess to the trust

beneficiaries. And the Stalsberg Trust also has the option of selling the Policy in the secondary market to generate funds to pay off the loan.

23.     All of these options – holding the Policy to maturity, using Policy proceeds to pay off a debt, and selling the Policy to a secondary-market purchaser – are available to any insurance policy owner and are in no way unique to the premium-financing transaction that is the basis for New York Life's purported rescission here. The mere fact that the Policy has been pledged as collateral for a loan, or potentially might at some point in the future be sold to a third party, does not render the Policy invalid and cannot justify New York Life's purported rescission, particularly at this time. As Justice Oliver Wendell Holmes recognized nearly a century ago in upholding the right of policy owners to sell their policies to third parties, "it is desirable to give life [insurance] policies the ordinary characteristics of property. . . . To deny the right to sell except to persons having such an interest [in the insured's life] is to diminish appreciably the value of the contract in the owner's hands." *Grigsby v. Russell*, 222 U.S. 149, 156 (1911); *see also* Utah Code Ann. § 31A-22-412 (codifying the principle that an "owner of any rights in a life insurance policy or annuity contract may assign any of those rights … [based on] general contract law"). Indeed, the Policy itself acknowledges as much, expressly stating that the Stalsberg Trust "can assign this policy, or any interest" therein. Policy § 7.9.

24.     Of course, Lonnie Stalsberg has made no decision on behalf of the Stalsberg Trust to sell the Policy to a third party or to dispose of it in any other particular manner. Nor is he obligated to sell the Policy or otherwise dispose of it in any particular way. At the inception of the Policy and to the present day, the Stalsberg Trust owns the Policy and is entitled to the coverage and tax and other benefits it provides.

### NEW YORK LIFE'S BAD FAITH RESCISSION

25.     Despite compliance with all the terms of the Policy, in a letter dated January 8, 2007, New York Life announced that it was rescinding the Policy.  The purported basis for New York Life's rescission was that the Policy was an "investor-owned life insurance policy that lacks an insurable interest."  New York Life Letter (attached at Exhibit 4).  New York Life's purported reason to rescind was not a valid basis for rescission.

26.     The basis for rescission articulated in the New York Life letter – that the owner of the Policy lacks an insurable interest in the life of Ralph Stalsberg – is simply false.  Under Utah law, an insurer may not issue insurance "to a person who does not have or expect to have an insurable interest in the subject of the insurance."  Utah Code Ann. § 31A-21-104(1)(a).  As explained above, the owner of the Policy is the Stalsberg Trust, the beneficiaries of which are Ralph Stalsberg's children and their heirs.  Children have an insurable interest in the life of their father under Utah law.  *Id*. § 31A-21-104(2)(a)(i).  Because the beneficiaries of the Stalsberg Trust – Ralph Stalsberg's children – have an insurable interest in the life of Ralph Stalsberg, New York Life cannot rescind the policy based on an alleged lack of insurable interest.

27.     On or about January 11, 2007, Coventry, as servicing agent under the Note, contacted New York Life and explained that the Stalsberg Trust, which had and has an insurable interest in the life of Ralph Stalsberg, is the owner of the Policy.  New York Life explained to Coventry that it nonetheless intended to rescind the Policy because the Policy might be sold to a third party in the future.

28.     New York Life's explanation for its decision to rescind is legally invalid.  Based on New York Life's reasoning, ***all*** life insurance policies would be subject to rescission at the

whim of the issuing insurer, since the Utah legislature has declared life insurance policies to be freely assignable at the discretion of the policy owner. Thus, the possibility that the Stalsberg Trust might sell the Policy at some indeterminate point in the future cannot justify New York Life's rescission of the Policy.

29. New York Life's purported rescission of the Policy reflects two objectives. First, New York Life hopes to monopolize the collateral value of the insurance policies it issues by restricting policy owners from seeking policy-secured loans from insurers other than itself. As explained above, New York Life states in the Policy (and, on information and belief, in other policies) that it will loan money secured by the Policy to the policy owner in an amount based on the cash surrender value of the policy. Because other lenders are willing to make loans to policy owners based on the *market* value of the policy, which is often greater than the cash surrender value offered by New York Life, the only way for New York Life to capture the collateral value of its policies is simply to prohibit loan arrangements with more favorable terms than it is willing or able to offer under threat of rescission. By limiting a policy owner's borrowing options in the marketplace, New York Life prevents policy owners from taking advantage of the full value of their life insurance investment.

30. Second, by restricting policy owners from engaging in premium finance arrangements in which the financed life insurance policy might one day be sold in the secondary market, New York Life can minimize its cost of paying death benefits and maximize the rate at which policies lapse. It is well documented in the life insurance literature that, in pricing life insurance policies, insurers operate on the assumption that the vast majority of policy owners will stop making premium payments and let their policies lapse, rather than retaining the policy

until the insured's death.  While premium finance arrangements such as that used by the Stalsberg Trust do not require that the underlying life insurance policy be sold in the secondary market, policy owners' knowledge of the true market value of their policies does marginally increase the likelihood that the policy might be sold to an investor that will maintain the policy in force until the insured's death.  And while such arrangements benefit both the insured (who is able to accomplish estate-planning objectives) and the original policy owner (who is able to receive benefits from the older generation while minimizing tax), they also increase the likelihood that the insurer (such as New York Life) might actually be required to pay the death benefit it promised to pay when it issued the policy.  In seeking to rescind the Policy based on the fear it might one day be sold to an investor that would hold the Policy until Ralph Stalsberg's death, New York Life hopes to minimize the possibility that the lapse-based pricing assumptions it employed when it first issued the Policy will be disrupted to its economic detriment.

31. New York Life's bad faith is also demonstrated by the timing of its purported rescission.  On February 1, 2006, New York Life confirmed that LaSalle was "record" owner for administrative purposes.  For nearly a year, while it continued to collect premium payments and enjoyed of those funds, New York Life did not contest the Policy.

32. In short, New York Life injured plaintiffs by purporting to rescind and failing to maintain the Policy in violation of the terms of the Policy and in bad faith.

COUNT I:  BREACH OF CONTRACT

33. Plaintiffs incorporate and reallege paragraphs 1 through 32 as though fully set forth herein.

34. New York Life entered into a life insurance contract (the Policy) to insure the life of Ralph Stalsberg.

35. New York Life announced that it was rescinding the Policy and returned all premiums paid on the Policy. Despite a request to maintain the Policy, New York Life failed to comply with their contractual obligation to maintain the Policy.

36. New York Life's breach of its contractual obligations has caused and will continue to cause financial injury to plaintiffs by, among other things, (a) depriving the Stalsberg Trust of ongoing investment income promised under the Policy, (b) depriving Ralph Stalsberg of the estate-planning objectives he had sought to secure through the purchase of the Policy, and (c) depriving the beneficiaries of the Stalsberg Trust of the death benefit and related tax benefits they had enjoyed under the Policy.

37. New York Life's breach of its contractual obligation was committed in bad faith and was intentionally committed for an improper purpose.

38. New York Life's conduct constitutes a breach of contract, for which plaintiffs are entitled to injunctive relief in the form of an order of specific performance, actual damages, consequential damages and attorneys' fees.

### COUNT II: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

39. Plaintiffs incorporate and reallege paragraphs 1 through 38 as though fully set forth herein.

40. New York Life entered into a life insurance contract (the Policy) to insure the life of Ralph Stalsberg.

41. Plaintiffs complied with the terms of the Policy.

42. New York Life engaged in conduct, separate and apart from the performance of obligations under the Policy, without good faith and for the purpose of depriving plaintiffs of rights and benefits under the Policy.

43. Defendants' conduct caused and will continue to cause financial injury to plaintiffs.

44. New York Life's conduct was committed in bad faith and intentionally committed for an improper purpose, including, without limitation, to avoid having to pay the death benefit.

45. New York Life's conduct constitutes a breach of the implied covenant of good faith and fair dealing, for which plaintiffs are entitled to injunctive relief in the form of an order of specific performance, actual damages, consequential damages and attorneys' fees.

## COUNT III: DECLARATORY JUDGMENT

46. Plaintiffs restate and incorporates paragraphs 1 through 45 as if fully set forth herein.

47. An actual case and controversy exists between plaintiffs and New York Life concerning New York Life's purported rescission of the Policy.

48. A declaration that plaintiffs have complied with all of the provisions of the Policy; that the Stalsberg Trust is the legal owner of the Policy; that the Stalsberg Trust has an insurable interest in the life of Ralph Stalsberg; and that New York Life's purported rescission is unlawful would redress some or all of the injury caused to plaintiffs by defendants' wrongful conduct.

49. Plaintiffs therefore are entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring that New York Life's purported rescission is unlawful.

### **P**RAYER **F**OR **R**ELIEF

WHEREFORE, plaintiffs pray that the Court enter judgment in its favor:

(1) Finding defendants, and each of them, liable on each and every count of the Complaint;

(2) Entering preliminary and permanent injunctive relief directing defendants, and each of them, to reinstate the Policy;

(3) Entering a declaratory judgment declaring that that plaintiffs have complied with all of the provisions of the Policy; that the Stalsberg Trust is the legal owner of the Policy; that the Stalsberg Trust has an insurable interest in the life of Ralph Stalsberg; and that New York Life's purported rescission is unlawful;

(4) Awarding plaintiffs their actual and consequential damages according to proof;

(5) Awarding plaintiffs their attorneys' fees and costs; and

(7) Awarding plaintiffs such other and further relief as the Court deems just and proper.

DATED this 18th day of January, 2007.

                                            Respectfully submitted,

                                            /s/ Erik A. Christiansen
                                            Erik A. Christiansen
                                            PARSONS BEHLE & LATIMER

## **EXHIBITS**

Exhibit 1 -    Universal Policy dated 01/21/2005

Exhibit 2 -    Note and Security Agreement dated April 20, 2005, between the Stalsberg Trust and LaSalle Bank National Association

Exhibit 3 -    Policy Control Agreement between LaSalle and the Stalsberg Trust

Exhibit 4 -    Letter dated January 8, 2007 from New York Life to LaSalle Bank, NA